IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE HAWKINS, | ) | CASE NO. 1:12CV1210 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Stephanie Hawkins ("Plaintiff" or "Hawkins") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

(the "Act"), 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  For the

following reasons, the final decision of the Commissioner should be **AFFIRMED.**

## I.  Procedural History

On March 17, 2009, Hawkins filed an application for SSI, alleging a disability onset date

of February 22, 2002.  Tr. 104-09, 135.  Hawkins claimed she was disabled due to a combination

of impairments, including severe brain trauma, dysphagia (difficulty swallowing), and

headaches.  Tr. 65, 75-77, 85-87, 104-109.  Her claim was denied initially and on

reconsideration, and she thereafter requested a hearing before an administrative law judge.  Tr.

70-71, 75-81, 85-91, 92-94.  On December 20, 2010, a hearing was held before Administrative

Law Judge Mark A. Clayton (the "ALJ").  Tr. 32-69.  On January 12, 2011, the ALJ issued a

decision finding that Hawkins was not disabled.  Tr. 13-26.  Hawkins requested review of the

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

ALJ's decision by the Appeals Council on February 10, 2011.  Tr. 12.  On March 26, 2012, the

Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-5.

## II.  Evidence

### A.      Background

Hawkins was born on January 10, 1968, and was 41 years old on the date she filed her

SSI application.  Tr. 24.  She obtained a general equivalency diploma (GED) and attended a

business college and bible school.  Tr. 39.  Hawkins got married in February 2010.  Tr. 38.  At

the time of the administrative hearing, she lived with her husband and her 90-year old father-in-

law.  Tr. 38.

### B.      Medical Evidence

#### 1.      Treatment History

On February 4, 2002, Hawkins sustained a brain injury when she was struck in the head

with a blunt object during an assault.  Tr. 204.  She was seen in the emergency department at

MetroHealth Medical Center ("MetroHealth") that day and was diagnosed with a left cerebellar

hemorrhage and left frontal and temporal contusions.  Tr. 234.  Hawkins underwent a right

ventriculostomy.  Tr. 234.  On March 20, 2002, she was transferred to a brain injury

rehabilitation program at MetroHealth.  Tr. 234.  She was discharged from the hospital on April

10, 2002, in good physical condition and with normal functional abilities.  Tr. 235-36.

Following her discharge, Hawkins was seen in the MetroHealth emergency department

on May 9, 2002, for swelling in her right leg and calf.  Tr. 231-33.  She also complained of

headache with blurred vision, neck pain, and vertigo.  Tr. 231-33.  At a visit on June 17, 2002,

with a neurologist, Dr. Joseph Hanna M.D., Hawkins reported having seizures, which she

2

described as periods of staring with confusion.  Tr. 228.  Physical examination revealed no significant problems and a subsequent EEG was normal.  Tr. 224, 226-29.  At an appointment on April 7, 2003, Hawkins reported mood swings, depression, headaches, and irritability.  Tr. 204.  Again, physical examination revealed no significant problems.  Tr. 204.

On May 20, 2003, Hawkins saw Dawn Trapp, M.Ed., a vocational counselor, who conducted a vocational assessment as part of Hawkins' rehabilitation program.  Tr. 124-129.  Ms. Trapp found that Hawkins had an interest and aptitudes compatible with work as a either a cosmetologist or a home attendant (Tr. 128), although she would need additional training for these positions.  Tr. 128.  Ms. Trapp found that Hawkins would require selective job placement and a job coach due to her inability to tolerate a fast-paced work environment. Tr. 128.

Hawkins did not seek any further medical care for five years, from 2003 to 2008.  Then, on October 22, 2008, Hawkins sought care for headaches and dizziness at Huron Hospital, where she was seen by George Paris, M.D.  Tr. 262.  Her mother informed Dr. Paris that Hawkins had experienced "absence episodes" and personality changes.  Tr. 262.  With the exception of tenderness on the left side of Hawkins' head, Dr. Paris noted normal physical, musculoskeletal, and neurological findings.  Tr. 262.  He prescribed medicine for Hawkins' chronic headaches and recommended a consultation with Joseph Zayat, M.D., a neurologist. Tr. 262.  Hawkins returned to Huron Hospital on November 5, 2008, because she lost her prescription, and was seen by Zhiyu Wang, M.D.  Tr. 265-66.  The doctor documented normal examination findings and gave her another prescription.  Tr. 266.

Hawkins began treatment for her headaches with Dr. Zayat on January 15, 2009.  Tr. 362.  An EEG study ordered by Dr. Zayat revealed no epileptiform discharges and was within normal limits.  Tr. 285.  At an appointment on March 9, 2009, Dr. Zayat noted that the EEG study and a

3

cervical spine MRI were both normal and that Hawkins was not taking any medication because she could not afford Topamax.  Tr. 362.  Hawkins had a normal general appearance, a normal mental status, normal speech, a normal gait, normal cranial nerves, a normal motor examination, normal coordination, symmetric deep tendon reflexes, and a normal sensory examination.  Tr. 362.  Dr. Zayat described Hawkins' condition as "fairly stable" and filled out forms so she could obtain Topamax through a financial assistance program.  Tr. 363.

Dr. Zayat completed a functional assessment for Hawkins on May 9, 2009.  Dr. Zayat noted that Ms. Hawkins had experienced a significant head injury "which affected many functions" (Tr. 303) and left her with "permanent residual disabilities."  Tr. 304.  He found no limitations in Hawkins' ability to stand, walk, and sit, but limited her to lifting and carrying no more than three pounds.  Tr. 303.  He also found that Hawkins could rarely/never climb, balance, stoop, crouch, kneel, or crawl.  Tr. 303.  Dr. Zayat stated that, because of problems with loss of feeling in Hawkins' right hand, manipulative functions could be performed only occasionally.  Tr. 304.  Dr. Zayat also opined that Hawkins would require more frequent breaks than normally provided in the workplace and would require a sit/stand option.  Tr. 304.  Dr. Zayat also completed an assessment of Hawkins' mental and cognitive abilities.  Tr. 305-306.  With regard to her capabilities to perform basic mental activities of work on a sustained basis, Dr. Zayat opined that Hawkins had "fair" abilities in 9 areas, including the abilities to follow work rules; use judgment;  maintain regular attendance and be punctual within customary tolerance; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out detailed, but not complex, job instructions; understand, remember and carry out simple instructions; socialize; management of

4

funds/schedules; and ability to leave home on own.  He opined that she had "poor" abilities in 11 areas, including maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine settings; deal with the public; relate to co-workers; interact with supervisor(s); function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stress; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; and relate predictably in social situations.  Tr. 306.

On June 1, 2009, Hawkins saw Dr. Zayat and complained of personality changes stemming from her use of Topamax.  Tr. 357-58.  Her mother reported to Dr. Zayat that Hawkins had unpleasant personality traits when she drank beer.  Tr. 357-58.  Dr. Zayat described Hawkins as a "healthy-looking, young woman" and documented normal physical and mental status findings.  Tr. 357.  He discontinued Topamax and prescribed Depakote .  Tr. 357.  Hawkins returned on June 30, 2009, to pick up the Depakote, which she had not yet started taking.  Tr. 352.  Despite her complaints of headaches and tremors, she had a normal general appearance, normal mental status, normal speech, a normal gait, and a negative Romberg's sign.  Tr. 352.

At a follow-up visit on August 12, 2009, Dr. Zayat reported that Hawkins had "reached a fairly decent balance" on Depakote.  Tr. 348.  She denied medication-related side effects but stated that she sometimes noticed exacerbation of her tremors.  Tr. 348.  Dr. Zayat noted that Hawkins' initial complaints of insomnia had improved.  Tr. 348.  He reported that Hawkins had a normal appearance, a normal mental status, normal speech, no pronator drift, symmetric strength, and symmetric deep tendon reflexes.  Tr. 348.

At an appointment with Dr. Zayat on November 12, 2009, Hawkins complained of depression but denied suicidal ideations.  Tr. 383.  She also reported that the frequency and

intensity of her headaches had lessened substantially but her tremors had worsened.  Tr. 383.  Dr. Zayat noted that Hawkins appeared nicely dressed and groomed.  Tr. 383.  With the exception of tremulous speech and a depressed affect, he noted normal examination findings.  Tr. 384.  He suggested that Hawkins wean off Depakote and start Amitriptyline.  Tr. 384.

After a 10-month hiatus, Hawkins returned to Dr. Zayat on September 15, 2010.  Tr. 406.  She complained of tremors associated with taking Depakote, denied weakness, admitted that the intensity of her headaches had lessened, and reported insomnia and difficulty falling asleep.  Tr. 406.  Dr. Zayat noted that Hawkins had a normal general appearance, normal cranial nerves, normal coordination, symmetric sensation, and suppressed (+1) deep tendon reflexes.  Tr. 407.  She appeared attentive, cooperative, and oriented, but her speech and language were tremulous.  Tr. 407.  Dr. Zayat found that Hawkins had a tremor in both hands when paper was placed on her hands while her arms were outstretched.  Tr. 407.  Dr. Zayat suggested that Hawkins wean off Depakote given its strong association with tremors.  Tr. 407.  He again prescribed Amitriptyline, but noted that Hawkins never filled a previous prescription for that medication.  Tr. 407.

On September 24, 2010, Dr. Zayat completed updated assessments of Hawkins' physical and mental capabilities.  Tr. 400-403.  In these assessments, his findings largely mirrored his findings from his prior assessments of May 2009.  Dr. Zayat upgraded Hawkins' abilities to crouch, kneel and crawl to occasional.  Tr. 400.  He also found that Hawkins' mental functional abilities had improved (he concluded that Hawkins had "good" abilities in 8 areas, had "fair" abilities in 8 areas, and "poor" abilities in 5 areas).  Tr. 402-03.

On October 21, 2010, Hawkins saw Dr. Zayat and reported significant depression due to the murder of her 23 year old son, but denied suicidal ideations, stated she could sleep, and reported improvement in her tremors after stopping Depakote.  Tr. 410.  With the exception of

6

noting that Hawkins appeared sad, Dr. Zayat documented normal physical and mental status findings.  Tr. 411.  He recommended counseling, prescribed Doxepin, and recommended a brace for Hawkins' left hand.  Tr. 411.

At an appointment on January 3, 2011 with Dr. Zayat, Hawkins complained of insomnia but denied vertigo, dizziness, headaches, and side effects from Doxepin.  Tr. 415.  Dr. Zayat noted that Hawkins' mother had called the doctor's office the previous week and expressed concern about Hawkins' rage and mood changes.  Tr. 415.  Dr. Zayat documented normal physical and mental examination findings and increased Hawkins' dose of Doxepin.  Tr. 416.

On February 14, 2011, Hawkins saw Dr. Zayat and reported significant improvement in her mood and sleep with the medication adjustment.  Tr. 419.  She noted an increased appetite but otherwise reported no side effects from the medication.  Tr. 419.  Dr. Zayat documented only Hawkins' vital signs and made no changes to her medication regimen.  Tr. 419.

### 2.      State Agency Physicians

#### a.      Consulting Physicians

At the state agency's request, Hawkins attended a consultative physical examination with Eulogio Sioson, M.D., on July 15, 2009.  Tr. 309-16.  She described her medical problem as a brain injury that caused intermittent tingling and numbness, tremors, headaches, vertigo, "absence seizures," memory and concentration problems, and rage.  Tr. 309.  She reported that she could only walk 1/4 of a block and could not use stairs, but that she had no problems sitting, doing household chores, dressing, grooming, showering, buttoning, tying, or grasping.  Tr. 309.  On examination, Hawkins walked normally without an assistive device.  Tr. 309.  She could not perform tandem walking or Romberg's testing due to balance problems but she was able to get up and down from the examination table.  Tr. 309-10.  Dr. Sioson noted unremarkable findings

with respect to Hawkins' skin, heart, lungs, abdomen, and extremities.  Tr. 309-10.  She exhibited no neck or lower back tenderness, no rigidity, slight left hand tremors, intact sensation, normal manual muscle testing, no muscle atrophy, and intact and equal reflexes.  Tr. 310.  She performed finger-to-nose testing, alternating hand movements, and finger tapping without difficulty, although she was somewhat slower with the left hand.  Tr. 310.  Dr. Sioson opined that Hawkins' ability to do work-related functions such as walking, standing, sitting, carrying and lifting would be impaired and limited to sedentary activities.  Tr. 310.  Dr. Sioson concluded by noting the need for a "neuropsychological evaluation" to evaluate Hawkins' complaints of rage and memory difficulties.  Tr. 310.

On July 31, 2009, Hawkins met with licensed clinical psychologist Jeff Rindsberg, Psy.D., at the state agency's request.  Tr. 317-22.  Hawkins recounted a history of childhood neglect, sexual abuse, homelessness, and substance abuse (alcohol, marijuana, and cocaine).  Tr. 317-19.  Hawkins reported that her only medication was Depakote and that it did not cause any side effects.  Tr. 318.  She denied a history of mental health treatment.  Tr. 319.  Hawkins stated that she showered, prepared meals, napped, watched television, cared for her personal needs independently, and interacted with family.  Tr. 320.  She stated that she could shop if someone was with her and that she walked rather than taking the bus.  Tr. 320.  Dr. Rindsberg noted that Hawkins exhibited no major cognitive problems and had normal speech, logical and goal-oriented language, normal expressive/receptive language skills, decent insight, and fair judgment.  Tr. 319.  He also noted that Hawkins appeared to be in "decent spirits," showed a full-range affect, denied suicidal/homicidal ideations, and displayed no delusions, phobias, or psychosis.  Tr. 319.  Dr. Rindsberg considered Hawkins to have average intelligence.  Tr. 319.  He stated that she performed "remarkably well" on the mental status questions and that, "had her

history not been known, there would have been no indication of underlying cognitive problems and her underlying traumatic brain injury." Tr. 319.  Dr. Rindsberg noted that Hawkins did not have a major mental illness and seemed to be doing fairly well despite her statements to the contrary.  Tr. 321.  Dr. Rindsberg diagnosed cognitive disorder, not otherwise specified (NOS); alcohol, cannabis, and cocaine dependence, which he noted were in remission for a couple of years; and personality change due to traumatic brain injury, aggressive type.  Tr. 321.  He assigned a Global Assessment of Functioning (GAF) score of 60.[2]  Tr. 321.  He opined that Hawkins could understand and follow directions, maintain attention, and perform simple, repetitive tasks, but that she would have moderate limitations in her ability to relate to others and withstand the stress and pressures associated with day-to-day work activities.  Tr. 320.

### b.  Reviewing Physicians

On August 22, 2009, state agency psychologist R. Kevin Goeke, Ph.D., reviewed the record to assess the severity of Hawkins' mental impairments and her mental residual functional capacity ("RFC").  Tr. 323-40.  He opined that Hawkins' cognitive disorder, NOS, and history of alcohol, cannabis, and cocaine dependence caused mild limitations in her ability to perform daily activities; moderate limitations in her ability to maintain social functioning; moderate limitations in her ability to maintain concentration, persistence, or pace; and no episodes of decompensation. Tr. 333.  Dr. Goeke concluded that Hawkins retained the mental capacity to perform simple and some multi-step tasks in a stable environment with low production quotas and minimal contact with the general public.  Tr. 339.  State agency psychologist Vicki Warren, Ph.D., independently reviewed the evidence on December 21, 2009, and affirmed Dr. Goeke's opinion.  Tr. 377-78.

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

On September 8, 2009, state agency physician Leigh Thomas, M.D., reviewed the medical evidence and assessed Hawkins' physical residual functional capacity.  Tr. 368-75.  Dr. Thomas opined that Hawkins could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and perform unlimited pushing and/or pulling consistent with her lifting and carrying abilities.  Tr. 370-72.  Dr. Thomas further opined that Hawkins should never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards (machinery, heights, etc.).  Tr. 370-72.  On December 22, 2009, state agency physician Willa Caldwell, M.D., independently reviewed the evidence and affirmed Dr. Thomas' RFC assessment in all respects.  Tr. 379.

**C.    Administrative Hearing**

**1.    Hawkins' Testimony**

On December 20, 2010, Hawkins appeared with counsel and testified at an administrative hearing before the ALJ.  Tr. 37-63.  The ALJ asked Hawkins to explain the impairments that she believed kept her from working, in order of severity.  Tr. 44.  Hawkins responded that the worst of her problems was her rage.  Tr. 44.  She stated that it would occur even when not directed at others.  Tr. 44.  Hawkins stated that Depakote helped control her feelings of rage and calmed her rage down "extremely," but caused her to have worsening tremors in her hands.  Tr. 49.  She stated that her prescription was switched to Doxepin and she felt that, with this medication, her rage was "creeping back in."  Tr. 51.

The second problem Hawkins stated that would prevent her from working were incidents where she would have a mental "blank," which she described as like daydreaming, where she would "drift off."  Tr. 44-45.  She stated that these incidents occurred several times in a day.  Tr. 51.  Hawkins also stated that she suffered from headaches but indicated that they had improved

10

to some extent with medication.  Tr. 45.  She also complained of swelling in her legs and swelling of her left arm.  Tr. 45.  She stated that swelling in her legs worsened when she increased her activities around the house, and that she would elevate her legs on pillows to reduce the swelling.  Tr. 46-47.  For her problems with her left arm/wrist, Hawkins stated that her doctor had recently prescribed a brace to wear on the left wrist.  Tr. 47.  However, she indicated that she did not wear the brace continuously because it made her wrist ache.  Tr. 47.  Hawkins further testified that she had problems with her balance and that she experienced dizziness when bending over (tr. 61) or on a ladder.  Tr. 62.

Hawkins testified about the limitations caused by her impairments.  She stated that she could lift a five pound bag of sugar.  Tr. 56.  She also stated that she had no problems with walking or standing.  Tr. 58-59.  She explained that she could stand "for a good while," which she quantified as an "hour or two," before she would need to sit down.  Tr. 58-59.  Hawkins then stated that she could sit for "quite a few hours" before she would need to get up and move around.  Tr. 59.  She testified that she could only climb two flights of stairs at a time.  Tr. 62.

Hawkins also testified as to her daily activities.  She stated that she helped her father-in-law by washing his clothes, fixing him meals, and cleaning his restroom.  Tr. 38-39, 53.  She further explained that, when she did the laundry, she sometimes required help from her husband because the laundry facilities were down a flight of stairs in the basement.  Tr. 54.  Hawkins also stated that she loaded and unloaded the dishwasher and shopped occasionally with her husband.  Tr. 53.  For a few months in 2007, Hawkins performed full-time work as an operations manager for a real estate company.  Tr. 40-42.  She stated that she then looked for other work.  Tr. 42.  She also testified that she worked with her grandmother putting on plays and youth programs.  Tr. 42.

11

### 2.      Vocational Expert's Testimony

Nancy J. Borgeson (the "VE") appeared at the hearing and testified as a vocational expert.  Tr. 63-69.  She stated that Hawkins had previously worked as receptionist, which was a semi-skilled position at the sedentary exertional level.  Tr. 64.  The ALJ noted, however, that the position was not substantial gainful activity.  Tr. 64.  The ALJ then asked the VE whether a hypothetical individual with Hawkins' vocational characteristics and the following limitations could perform any work in the national economy:

> [C]ould work at the light exertional level; however, this person is not to climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs.  Further, this person must avoid hazards, such as working in unprotected heights or working around dangerous, moving machinery.  This person can do simple, routine, repetitive tasks in a stable environment that is not fast-paced and does not have high production quotas – in other words, minimum production quotas.  This person can have superficial contact with supervisors and co-workers, but only infrequent contact with the general public.

Tr. 64.  The VE responded that the hypothetical person could perform unskilled, light work that existed in significant numbers in the national economy, including the following jobs: cleaner, housekeeping  (2,500 jobs in the northeast Ohio, 12,000 jobs in Ohio, and 1,000,000 jobs nationally), mail clerk (non-postal) (1,400 jobs in northeast Ohio, 7,000 jobs in Ohio, and 139,000 jobs nationally), and visual inspector/gasket inspector (3,000 jobs in northeast Ohio, 15,000 jobs in Ohio, and 300,000 jobs nationally).  Tr. 64-65.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  Id.

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Hawkins had not engaged in substantial gainful activity since March 17, 2009, the application date.   Tr. 18.  At Step Two, he found that Hawkins had the following severe impairments: traumatic brain injury, headaches, seizures, depression, cognitive disorder not otherwise specified, and personality changes due to traumatic brain injury, aggressive type.  Tr. 18-19.  At Step Three, the ALJ found that Hawkins did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[3]  Tr. 19-20.  The ALJ then determined Hawkins' RFC and found that she could perform light work with the following restrictions:

> [S]he can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; must avoid all hazards such as working at unprotected heights or around dangerous moving machinery.   Further, the claimant is limited to performing simple, routine, repetitive tasks in a stable environment that is not fast-paced and has minimum production quotas.   She is further limited to positions involving only superficial contact with supervisors and co-workers, and involving only infrequent contact with the general public.

Tr. 20-24.  At Step Four, the ALJ found that Hawkins had no past relevant work.  Tr. 24. Finally, at Step Five, after considering her vocational factors, RFC, and the evidence from the VE, the ALJ found that Hawkins was capable of performing work that existed in significant numbers in the national economy.  Tr. 25-26.  Thus, the ALJ concluded that Hawkins was not disabled.  Tr. 26.

---

[3]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## V.  Arguments of the Parties

Hawkins objects to the ALJ's decision on three grounds.  First, she argues that the ALJ erred at Step Two by not finding her dizziness and vertigo to be severe impairments.  Second, Hawkins contends that the ALJ erred in evaluating the opinions of both her treating physician and a state agency consultative examiner.  Third, Hawkins asserts that the ALJ erred in basing his RFC determination on the findings of a non-examining physician and on a vocational evaluation that was conducted in May 2003.

In response, the Commissioner asserts that substantial evidence supports the ALJ's decision.  In particular, the Commissioner argues that the ALJ's Step Two finding should not be disturbed because the evidence failed to establish that Hawkins' alleged dizziness and vertigo were severe impairments.  The Commissioner also argues that the ALJ properly evaluated the medical source opinions.  The Commissioner further argues that substantial evidence supports the ALJ's RFC determination.

## VI.  Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.    The ALJ did not commit reversible error at Step Two in finding that some of Hawkins' impairments were not severe**

Hawkins contends that the ALJ erred by failing to include her conditions of vertigo and dizziness as severe impairments under Step Two of the sequential analysis.  Doc. 14, pp. 10-12. A "severe impairment" is defined as an impairment or combination of impairments "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c).  The claimant has the burden at Step Two to establish that she "suffers from a severe medically determinable physical or mental impairment." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  The severity determination is "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.*

Hawkins argues that her dizziness and vertigo had more than a minimal affect on her ability to work, and thus the ALJ erred in concluding otherwise.  Hawkins' argument, however, is misguided.  At Step Two, the claimant has the burden to prove that at least one of her impairments is severe. *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190 (6th Cir.2009). If the ALJ finds that at least one of her impairments is severe, the ALJ must consider *both* the severe and non-severe impairments in the remaining steps. *Id.* (citing *Anthony v. Astrue,* 266 F.

16

App'x 451, 457 (6th Cir.2008)). "In other words, '[o]nce *one* severe impairment is found, the combined effect of *all* impairments must be considered, even if other impairments would not be severe.'" *Id.* at 190 (emphasis added) (quoting *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 787 (6th Cir.2009)). Therefore, the Sixth Circuit has explained that it is "legally irrelevant" that some of a claimant's impairments were considered non-severe if others were found to be severe and the ALJ considered both the severe and non-severe impairments in the remaining steps. *Id.*; see also *Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir.1987)

In this case, the Court need not reach the question whether the ALJ erred in failing to find Hawkins' dizziness and vertigo to be severe impairments because, even if the ALJ's determination was erroneous, the error would not warrant a reversal. At Step Two, the ALJ found that Hawkins suffered from the following severe impairments: traumatic brain injury, headaches, seizures, depression, cognitive disorder not otherwise specified, and personality changes due to traumatic brain injury, aggressive type. Tr. 18. He then proceeded to review Hawkins' claim through Step Five of the sequential process. In doing so, he specifically addressed Hawkins' dizziness and vertigo in his RFC analysis. Tr. 21-22. Accordingly, the ALJ's failure to find Hawkins' dizziness and vertigo to be severe impairments is not error requiring reversal. *See Maziarz*, 837 F.2d at 244 (failure of Secretary to find that an impairment was severe was not reversible error because he found that claimant had other severe impairments); *Pompa v. Comm'r of Soc. Sec*., 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").

17

**C.**     **The ALJ properly evaluated the medical opinions of treating physician, Dr. Zayat, and consultative examiner, Dr. Sioson, under the Regulations**

   **1.**     **Dr. Zayat**

Hawkins argues that the ALJ failed to follow the treating physician rule in evaluating the opinion of Dr. Zayat, her treating neurologist.  Doc. 14, p. 12.  Specifically, Hawkins contends that the ALJ's assignment of "no weight" to Dr. Zayat's opinions is not supported by substantial evidence.  Doc. 14, pp. 12-15.  Contrary to this argument, the undersigned concludes that the ALJ properly evaluated Dr. Zayat's opinions in accordance with the treating physician rule.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to set forth a detailed analysis with respect to each and every one of the factors listed above.  *See Francis v. Comm'r of Soc. Sec.*,

414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

Dr. Zayat, who began treating Hawkins in 2009, completed two separate assessments of her physical capacities, on May 9, 2009 (Tr. 303-304) and September 24, 2010, respectively.  Tr. 400-401.  In his May 2009 assessment, Dr. Zayat found no limitations in Hawkins' ability to stand, walk, and sit but limited her to lifting and carrying no more than three pounds.  Tr. 303.  He also found that Hawkins could rarely/never climb, balance, stoop, crouch, kneel, or crawl.  Tr. 303.  Dr. Zayat opined that, because of problems with loss of feeling in Hawkins' right hand, manipulative functions could be performed only occasionally.  Tr. 304.  Dr. Zayat stated that Hawkins would require more frequent breaks than normally provided in the workplace and would require a sit/stand option.  Tr. 304.  He also completed an assessment of Hawkins' mental and cognitive abilities, as set forth above.  Tr. 305-306.  In his September 2010 assessment, Dr. Zayat's findings were consistent with those in his initial assessment except that he upgraded Hawkins' abilities to crouch, kneel and crawl to occasional and found that Hawkins' mental functional abilities had improved.  Tr. 402-03.

The ALJ evaluated Dr. Zayat's opinions, as well as the record as a whole, and reasonably assigned no weight to his opinions.  In reaching this conclusion, the ALJ found it significant that Dr. Zayat had only seen Hawkins several times and treated her mainly for post-traumatic headaches.  In addition, the ALJ explained that Dr. Zayat's opinions regarding Hawkins' physical and mental limitations were directly contradicted by his own documented clinical observations.  Tr. 24.  The ALJ noted, for example, that, while Dr. Zayat opined that Hawkins could only lift/carry three pounds due to tremors or numbness in her hand, his treatment records

19

contained no mention of numbness or any findings of decreased sensation in her extremities.  Tr. 24.  The ALJ concluded that Dr. Zayat's opinions appeared to be based on Hawkins' subjective complaints rather than positive clinical findings or problems because his opinions were unsupported by his own progress notes.  Tr. 24.  Further, with regard to her mental limitations, the ALJ noted that Dr. Zayat's specialty was neurology, not mental health.  The ALJ found that, because Dr. Zayat was not a mental health expert, his opinion regarding Hawkins' mental capabilities was beyond the scope of his field of expertise and, thus, warranted limited weight under regulations.  Tr. 24.  20 C.F.R. § 416.927(c)(5).  This discussion demonstrates that the ALJ discounted Dr. Zayat's opinions under the following factors: (1) frequency of examinations, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion, and (5) specialization of the source.  The ALJ therefore stated good reasons for assigning less than controlling weight to Dr. Zayat's opinion and fulfilled his obligations under the regulations.  *See, e.g., Allen v. Comm'r of Soc. Sec*., 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion).

A review of the record reveals that the reasons provided by the ALJ for discounting Dr. Zayat's opinions are supported by substantial evidence.  After treatment for the severe head injury she suffered in February 2002, Hawkins neither required nor sought medical care between 2003 and 2008, and sought no treatment between November 2009 and September 2010. Moreover, from October 2008 through the date of the ALJ's decision, Hawkins' medical treatment was routine and conservative – she merely attended routine office visits with Dr. Zayat and took medication.  Tr. 341-67, 380-93, 404-425.  Between March 2009 and January 2011, Dr.

Zayat reported minimally abnormal findings at just three visits.  *See* Tr. 384 (tremulous speech and depressed affect); Tr. 407 (suppressed +1 deep tendon reflexes, tremulous speech, and tremors in both hands); Tr. 411 (sad appearance). Otherwise, at virtually every visit, Dr. Zayat reported that Hawkins exhibited a normal general appearance, a normal mental status, normal speech, a normal gait, normal cranial nerves, a normal motor examination, normal coordination, symmetric deep tendon reflexes, and a normal sensory examination.  Tr. 348, 357, 362, 384, 407, 411, 415, 419.  Hawkins' symptoms also improved with medication.  Indeed, with proper medication adjustments, she reported dramatic improvement in her headaches, tremors, insomnia, and mood.  Tr. 348, 363, 383, 406, 410, 415, 419.

Additionally, the state agency reviewing physicians opined that Hawkins' impairments did not rise to a disabling level.  Agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  With regard to limitations from her physical impairments, Dr. Thomas opined that Hawkins retained the ability to lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours and sit for about 6 hours during an 8-hour workday; and perform unlimited pushing and/or pulling consistent with her lifting and carrying abilities, but she should never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards (machinery, heights, etc.).  Tr. 370, 372, 379.  With regard to limitations from her mental impairments, Dr. Goeke opined that Hawkins retained the mental capacity to perform simple, and some multi-step, tasks in a stable environment with low production quotas and minimal contact with the general public.  Tr. 339, 377-78.  Dr. Rindsberg, the consultative psychological examiner, also opined that Hawkins could understand and follow directions, maintain attention, and perform simple, repetitive tasks, and that she had only moderate limitations in her ability to relate to others and

withstand the stress and pressures associated with day-to-day work activities.  Tr. 320.

Finally, as noted by the ALJ, Hawkins was able to perform a wide range of daily activities.  Tr. 19.  At the administrative hearing, Hawkins testified that she got married in February 2010; helped her 90-year-old father-in-law by washing his clothes, fixing him meals, and cleaning his restroom; loaded and unloaded the dishwasher; and shopped occasionally with her husband.  Tr. 38-39, 53.  She also stated that she showered, prepared meals, napped, watched television, cared for her personal needs independently, interacted with family, and walked rather than taking the bus.  Tr. 319-20.

All of this evidence supports the ALJ's determination that Hawkins could perform light work subject to the restrictions set forth in the ALJ's RFC.  Hawkins, however, cites to other evidence in the record and argues that this evidence shows that she was more impaired than found by the ALJ.  Tr. 10-15.  Even if there is evidence to support Hawkins' position, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted).  "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* at 773 (citations omitted).  In this case, the ALJ reviewed the entire record, weighed the evidence, and concluded that Hawkins retained the ability to perform light work subject to certain limitations.  Even assuming there is evidence in the record that supports Hawkins' claim she was more limited than found by the ALJ, substantial evidence also supports the ALJ's conclusion that Hawkins could perform some work.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot

be overturned). Based on the applicable standard of review set forth above, the ALJ's decision should be affirmed.

>    **2.** **Dr. Sioson**

Hawkins also argues that the ALJ did not properly evaluate the opinion of Dr. Sioson, the state agency consulting physician who examined Hawkins and assessed her physical impairments. Doc. 14, p, 15. As discussed above, Dr. Sioson examined Hawkins on one occasion and opined that Hawkins' ability to do work-related functions such as walking, standing, sitting, carrying and lifting would be impaired and limited to sedentary activities. Tr. 310. Hawkins argues that ALJ improperly discounted this opinion. This argument is without merit.

Because Dr. Sioson was not a treating physician, his opinion is not entitled to the same deference as a treating source's opinion. *See, e.g., Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and her maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records. *Id.* Dr. Sioson examined Hawkins on only one occasion and, as such, the rationale underlying the treating physician doctrine does not apply here. *Id.*

Further, the ALJ considered Dr. Sioson's opinion and provided several reasons for assigning no weight to it in accordance with the applicable regulations. Tr. 24. *See* 20 C.F.R. § 416.927. First, the ALJ found that Dr. Sioson's opinion was vague with regard to the extent of Hawkins' limitations. Tr. 24. Dr. Sioson simply stated that Hawkins' ability to do work-related functions such as walking, standing, sitting, carrying, and lifting would be impaired and limited

to sedentary activities.  Tr. 310.  However, he did not indicate if Hawkins was totally precluded from such activities or whether limited frequency or duration of these activities could be tolerated.  *Id.*  He also failed to explain how Hawkins' traumatic brain injury, tremors, and dizziness/vertigo, which he found Hawkins to suffer from, led him to conclude that Hawkins would have difficulty standing, walking, sitting, and lifting and carrying objects, especially in light of his other relatively normal examination findings.  Vagueness is a proper reason for discounting a medical opinion.  *Harris v. Commissioner of Social Sec.*, No. 1:11 CV 571, 2012 WL 4505853 (N.D. Ohio Sept. 28, 2012) (finding that the ALJ is not required to give any weight to vague opinions with no specific limitations).  Second, the ALJ concluded that Dr. Sioson's opinion was not supported by his own exam findings.  Tr. 24.  The ALJ noted that Dr. Sioson appeared to base his opinion solely on Hawkins' subjective complaints rather than objective evidence from the examination.  Tr. 24.  As set forth above, during his examination, Dr. Sioson noted largely unremarkable mental and physical findings.  Tr. 309-10.  Because his clinical observations failed to correspond with his opinion that Hawkins could perform only sedentary work, the ALJ properly declined to assign any weight to the opinion.  Tr. 309-10.

The ALJ considered Dr. Sioson's opinion, as well as the regulatory factors set forth above, and reasonably concluded that no weight should be given to Dr. Sioson's opinion.  *Id.* For the same reasons set forth in the preceding section with regard to the opinions of Dr. Zayat, the ALJ's decision to assign no weight to the opinion of Dr. Sioson is supported by substantial evidence in the record.  Accordingly, the ALJ properly evaluated the opinion of Dr. Sioson.

**D.      Substantial Evidence supports the ALJ's RFC determination**

In her final argument, Hawkins argues that the ALJ erred in basing his RFC determination on the findings of a non-examining physician and a vocational evaluation from May 2003.  Doc. 14, p. 17.  This argument, in effect, challenges whether substantial evidence supports the ALJ's RFC determination.  Contrary to this argument, the undersigned concludes that substantial evidence supports the ALJ's RFC determination.

A claimant's RFC is a measure of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545, 416.945.  The ALJ is responsible for assessing a claimant's RFC based on the relevant evidence.  20 C.F.R. §§ 404.1545, 404.1546(c).  In reaching an RFC determination, the ALJ may consider both medical and non-medical evidence. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  It is not the Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Thus, even if substantial evidence supports an RFC determination different than that found by the ALJ, the Court must nevertheless affirm so long as substantial evidence also supports the ALJ's position. *See Jones*, 336 F.3d at 477.

The ALJ determined that Miller retained the RFC to perform light work subject to the following restrictions: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; no exposure to hazards, such as working in unprotected heights or working around dangerous, moving machinery; simple, repetitive tasks in a stable environment that is not fast-paced and has minimum production quotas; only superficial contact with supervisors and co-workers; and only infrequent contact with the general public.  Tr. 21.  A review of the record shows that the ALJ's RFC determination is supported by substantial evidence.  For example:

-      In May 2003 – 15 months after her severe head injury – Hawkins underwent a vocational assessment by a physical medicine and rehabilitation expert, who opined

25

that Hawkins retained the functional abilities to perform light to medium work that
was semi-skilled in nature (Tr. 124-29);

- After treatment for the head injuries she suffered in February 2002, Hawkins neither
  required nor sought medical care between 2003 and 2008, and she sought no
  treatment between November 2009 and September 2010;
- An EEG study and cervical spine MRI taken in January 2009 were normal (Tr. 362);

- From October 2008 through the date of the ALJ's decision, Hawkins' medical
  treatment was routine and conservative – she merely attended routine office visits
  with Dr. Zayat and took medication (Tr. 341-67, 380-93, 404-425);

- With proper medication adjustments, Hawkins reported dramatic improvement in her
  headaches, tremors, insomnia, and mood (Tr. 348, 363, 383, 406, 410, 415, 419);

- All of the doctors who examined Hawkins after she resumed treatment in 2008 (two
  doctors from Huron Hospital, Dr. Zayat, consultative physical examiner Dr. Sioson,
  and consultative psychological examiner Dr. Rindsberg) documented unremarkable
  physical and mental status findings (Tr. 262, 266, 348, 309-10, 317-20, 357, 362, 384,
  407, 410, 415, 419);

- After examining Hawkins, state agency consulting psychologist Dr. Rindsberg opined
  that "had her history not been known, there would have been no indication of
  underlying cognitive problems and her underlying traumatic brain injury" (Tr. 319);

- Hawkins reported to Dr. Rindsberg that she showered, prepared meals, napped,
  watched television, cared for her personal needs independently, interacted with
  family, could shop if someone was with her, and walked rather than taking the bus
  (Tr. 319-20).

- Dr. Rindsberg opined that Hawkins could understand and follow directions, maintain
  attention, and perform simple, repetitive tasks, and that she had only moderate
  limitations in her ability to relate to others and withstand the stress and pressures
  associated with day-to-day work activities (Tr. 320);

- State agency psychologist Dr. Goeke reviewed the medical evidence and opined that
  Hawkins retained the mental capacity to perform simple, and some multi-step, tasks
  in a stable environment with low production quotas and minimal contact with the
  general public (Tr. 339, 377-78);

- State agency physician Dr. Thomas reviewed the medical evidence and opined that
  Hawkins retained the ability to lift 20 pounds occasionally and 10 pounds frequently;
  stand and/or walk for about 6 hours and sit for about 6 hours during an 8-hour
  workday; and perform unlimited pushing and/or pulling consistent with her lifting
  and carrying abilities, but she should never climb ladders, ropes, or scaffolds and
  should avoid all exposure to hazards (machinery, heights, etc.) (Tr. 370, 372, 379);

26

- Hawkins reported to state agency consultative physician Dr. Sioson that she had no problems sitting, doing household chores, dressing, grooming, showering, buttoning, tying, or grasping (Tr. 309);

- At the administrative hearing, Hawkins testified that she got married in February 2010; helped her 90-year-old father-in-law by washing his clothes, fixing him meals, and cleaning his restroom; loaded and unloaded the dishwasher; and shopped occasionally with her husband (Tr. 38-39, 53); and

- Hawkins performed full-time work as an operations manager for a real estate company for a few months in 2007 (Tr. 40-42); she applied for work following that employment (Tr. 42); and she also worked with her grandmother putting on plays and youth programs (Tr. 42).

As the foregoing summary demonstrates, there is substantial evidence in the record to support the ALJ's RFC determination.

Hawkins argues that the ALJ improperly considered the May 2003 vocational assessment conducted by Ms. Trapp in his RFC analysis.  Doc. 14, p. 17.  This argument is meritless.  When determining a claimant's RFC, the ALJ is required to evaluate every medical opinion in the record, regardless of its source.  20 C.F.R. § 416.927(d).  A "medical opinion" is defined as a statement from a physician, psychologist, or "other acceptable medical source" that reflects "judgments about the nature and severity of [a claimant's] impairment(s)."  20 C.F.R. § 416.927(a) (2). "Other acceptable medical sources" are licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. §§ 416.913(a); 416.902 ("acceptable medical source refers to one of the sources described in § 416.913(a) who provides evidence about [a claimant's] impairments").  Here, the ALJ correctly recognized that Ms. Trapp was not an acceptable medical source.  Accordingly, Ms. Trapp's evaluation was not a "medical opinion," and the ALJ was not required to consider it as such or to accord it any special deference.  See 20 C.F.R. § 416.927(a)(2). However, the ALJ was still required to consider

evidence from "other sources," which would include the vocational evaluation. Therefore, the ALJ did not error in considering Ms. Trapp's opinion.[4]

Hawkins also argues that the ALJ should not have relied upon Ms. Trapp's opinion because it was issued before the relevant period with regard to her SSI application. Hawkins correctly states that supplemental security income is not payable prior to the month following the month in which the application was filed. 20 C.F.R. § 416.335. Hawkins filed her SSI application on March 17, 2009. She therefore argues that the May 2003 vocational evaluation was too remote and should not have been given significant weight. This argument is unpersuasive in this case. The ALJ is required to consider all of the record evidence before rendering a disability determination. 20 C.F.R. § 416.912. The vocational evaluation was part of the medical record. More importantly, Hawkins alleges that she became disabled on February 22, 2002 (Tr. 104-09, 135) and relies on treatment records from 2002 and 2003 with regard to her head injuries to support her arguments. As such, the May 2003 vocational evaluation is not too remote and the ALJ properly consider this evidence, along with the other evidence from 2002 and 2003, in evaluating Hawkins' claim for disability.

Finally, Hawkins contends that the ALJ erred in affording significant weight to the opinions of the state agency reviewing physicians. Doc. 14, pp. 18-19. This argument lacks merit. State agency physicians and psychologists are considered "highly qualified" and "experts

---

[4] With regard to explaining the consideration given to opinions from "other sources," Social Security Ruling ("SSR") 06–03p states as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, *the adjudicator generally should explain the weight given to opinions from these "other sources,"* or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, at *6 (emphasis added).

in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(I).  Further, in reaching a

disability determination, the ALJ is required to evaluate the opinions of reviewing physicians

under the relevant factors for evaluating medical opinion evidence. See 20 C.F.R. §

416.927(e)(2)(ii). In this case, the ALJ properly evaluated the opinions of the state agency

reviewing physicians and found that such opinions were consistent with the objective medical

evidence (discussed above).  Tr. 24.  *See* 20 C.F.R. § 416.927(d)(4) (stating that the ALJ

considers consistency with the record as a whole when deciding the weight to be given to a

medical opinion). Therefore, the ALJ's analysis of the opinions from the state agency reviewing

physicians was proper.

In sum, the ALJ reviewed the entire record, weighed the evidence, and concluded that

Hawkins retained the ability to do light work subject to certain limitations.  The ALJ adequately

accounted for all of Hawkins' credibly established limitations in the RFC assessment.  This

determination is supported by substantial evidence in the record and should be affirmed.

## VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff

Stephanie Hawkins' application for SSI should be AFFIRMED.

Dated: March 19, 2013

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).