IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE HAWKINS, | ) | CASE NO. 1:12 CV 1210 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | Magistrate Judge Kathleen B. Burke |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Report and Recommendation of Magistrate Judge Kathleen B. Burke (Docket #16), recommending that the Commissioner of Social Security's final determination denying Plaintiff, Stephanie Hawkins' application for Supplemental Security Income be affirmed.

**Factual and Procedural Background**

As set forth by the Magistrate Judge, the factual and procedural history of this case is as follows:

**I. Procedural History**

On March 17, 2009, Hawkins filed an application for SSI, alleging a disability onset date of February 22, 2002. Tr. 104-09, 135. Hawkins claimed she was disabled due to a combination of impairments, including severe brain trauma, dysphagia (difficulty swallowing), and headaches. Tr. 65, 75-77, 85-87, 104-109. Her claim was denied initially and on reconsideration, and she thereafter requested a hearing before an administrative law judge. Tr. 70-71, 75-81, 85-91, 92-94. On

December 20, 2010, a hearing was held before Administrative Law Judge Mark A. Clayton (the "ALJ"). Tr. 32-69. On January 12, 2011, the ALJ issued a decision finding that Hawkins was not disabled. Tr. 13-26. Hawkins requested review of the ALJ's decision by the Appeals Council on February 10, 2011. Tr. 12. On March 26, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence
### A. Background

Hawkins was born on January 10, 1968, and was 41 years old on the date she filed her SSI application. Tr. 24. She obtained a general equivalency diploma (GED) and attended a business college and bible school. Tr. 39. Hawkins got married in February 2010. Tr. 38. At the time of the administrative hearing, she lived with her husband and her 90-year old father-in-law. Tr. 38.

### B. Medical Evidence
### 1. Treatment History

On February 4, 2002, Hawkins sustained a brain injury when she was struck in the head with a blunt object during an assault. Tr. 204. She was seen in the emergency department at MetroHealth Medical Center ("MetroHealth") that day and was diagnosed with a left cerebellar hemorrhage and left frontal and temporal contusions. Tr. 234. Hawkins underwent a right ventriculostomy. Tr. 234. On March 20, 2002, she was transferred to a brain injury rehabilitation program at MetroHealth. Tr. 234. She was discharged from the hospital on April 10, 2002, in good physical condition and with normal functional abilities. Tr. 235-36.

Following her discharge, Hawkins was seen in the MetroHealth emergency department on May 9, 2002, for swelling in her right leg and calf. Tr. 231-33. She also complained of headache with blurred vision, neck pain, and vertigo. Tr. 231-33. At a visit on June 17, 2002, with a neurologist, Dr. Joseph Hanna M.D., Hawkins reported having seizures, which she described as periods of staring with confusion. Tr. 228. Physical examination revealed no significant problems and a subsequent EEG was normal. Tr. 224, 226-29. At an appointment on April 7, 2003, Hawkins reported mood swings, depression, headaches, and irritability. Tr. 204. Again, physical examination revealed no significant problems. Tr. 204.

On May 20, 2003, Hawkins saw Dawn Trapp, M.Ed., a vocational counselor, who conducted a vocational assessment as part of Hawkins' rehabilitation program. Tr. 124-129. Ms. Trapp found that Hawkins had an interest and aptitudes compatible with work as a either a cosmetologist or a home attendant (Tr. 128), although she would need additional training for these positions. Tr. 128. Ms. Trapp found that Hawkins would require selective job placement and a job coach due to her inability to tolerate a fast-paced work environment. Tr. 128.

Hawkins did not seek any further medical care for five years, from 2003 to 2008. Then, on October 22, 2008, Hawkins sought care for headaches and dizziness at Huron Hospital, where she was seen by George Paris, M.D. Tr. 262. Her mother informed Dr. Paris that Hawkins had experienced "absence episodes" and personality changes. Tr. 262. With the exception of tenderness on the left side of Hawkins' head,

Dr. Paris noted normal physical, musculoskeletal, and neurological findings. Tr. 262. He prescribed medicine for Hawkins' chronic headaches and recommended a consultation with Joseph Zayat, M.D., a neurologist. Tr. 262. Hawkins returned to Huron Hospital on November 5, 2008, because she lost her prescription, and was seen by Zhiyu Wang, M.D. Tr. 265-66. The doctor documented normal examination findings and gave her another prescription. Tr. 266.

Hawkins began treatment for her headaches with Dr. Zayat on January 15, 2009. Tr. 362. An EEG study ordered by Dr. Zayat revealed no epileptiform discharges and was within normal limits. Tr. 285. At an appointment on March 9, 2009, Dr. Zayat noted that the EEG study and a cervical spine MRI were both normal and that Hawkins was not taking any medication because she could not afford Topamax. Tr. 362. Hawkins had a normal general appearance, a normal mental status, normal speech, a normal gait, normal cranial nerves, a normal motor examination, normal coordination, symmetric deep tendon reflexes, and a normal sensory examination. Tr. 362. Dr. Zayat described Hawkins' condition as "fairly stable" and filled out forms so she could obtain Topamax through a financial assistance program. Tr. 363.

Dr. Zayat completed a functional assessment for Hawkins on May 9, 2009. Dr. Zayat noted that Ms. Hawkins had experienced a significant head injury "which affected many functions" (Tr. 303) and left her with "permanent residual disabilities." Tr. 304. He found no limitations in Hawkins' ability to stand, walk, and sit, but limited her to lifting and carrying no more than three pounds. Tr. 303. He also found that Hawkins could rarely/never climb, balance, stoop, crouch, kneel, or crawl. Tr. 303. Dr. Zayat stated that, because of problems with loss of feeling in Hawkins' right hand, manipulative functions could be performed only occasionally. Tr. 304. Dr. Zayat also opined that Hawkins would require more frequent breaks than normally provided in the workplace and would require a sit/stand option. Tr. 304. Dr. Zayat also completed an assessment of Hawkins' mental and cognitive abilities. Tr. 305-306. With regard to her capabilities to perform basic mental activities of work on a sustained basis, Dr. Zayat opined that Hawkins had "fair" abilities in 9 areas, including the abilities to follow work rules; use judgment; maintain regular attendance and be punctual within customary tolerance; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out detailed, but not complex, job instructions; understand, remember and carry out simple instructions; socialize; management of funds/schedules; and ability to leave home on own. He opined that she had "poor" abilities in 11 areas, including maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine settings; deal with the public; relate to co-workers; interact with supervisor(s); function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stress; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; and relate predictably in social situations. Tr. 306.

On June 1, 2009, Hawkins saw Dr. Zayat and complained of personality changes stemming from her use of Topamax. Tr. 357-58. Her mother reported to Dr. Zayat that Hawkins had unpleasant personality traits when she drank beer. Tr. 357-58. Dr. Zayat described Hawkins as a "healthy-looking, young woman" and documented normal physical and mental status findings. Tr. 357. He discontinued Topamax and prescribed Depakote. Tr. 357. Hawkins returned on June 30, 2009, to pick up the Depakote, which she had not yet started taking. Tr. 352. Despite her complaints of headaches and tremors, she had a normal general appearance, normal mental status, normal speech, a normal gait, and a negative Romberg's sign. Tr. 352.

At a follow-up visit on August 12, 2009, Dr. Zayat reported that Hawkins had "reached a fairly decent balance" on Depakote. Tr. 348. She denied medication-related side effects but stated that she sometimes noticed exacerbation of her tremors. Tr. 348. Dr. Zayat noted that Hawkins' initial complaints of insomnia had improved. Tr. 348. He reported that Hawkins had a normal appearance, a normal mental status, normal speech, no pronator drift, symmetric strength, and symmetric deep tendon reflexes. Tr. 348.

At an appointment with Dr. Zayat on November 12, 2009, Hawkins complained of depression but denied suicidal ideations. Tr. 383. She also reported that the frequency and intensity of her headaches had lessened substantially but her tremors had worsened. Tr. 383. Dr. Zayat noted that Hawkins appeared nicely dressed and groomed. Tr. 383. With the exception of tremulous speech and a depressed affect, he noted normal examination findings. Tr. 384. He suggested that Hawkins wean off Depakote and start Amitriptyline. Tr. 384.

After a 10-month hiatus, Hawkins returned to Dr. Zayat on September 15, 2010. Tr. 406. She complained of tremors associated with taking Depakote, denied weakness, admitted that the intensity of her headaches had lessened, and reported insomnia and difficulty falling asleep. Tr. 406. Dr. Zayat noted that Hawkins had a normal general appearance, normal cranial nerves, normal coordination, symmetric sensation, and suppressed (+1) deep tendon reflexes. Tr. 407. She appeared attentive, cooperative, and oriented, but her speech and language were tremulous. Tr. 407. Dr. Zayat found that Hawkins had a tremor in both hands when paper was placed on her hands while her arms were outstretched. Tr. 407. Dr. Zayat suggested that Hawkins wean off Depakote given its strong association with tremors. Tr. 407. He again prescribed Amitriptyline, but noted that Hawkins never filled a previous prescription for that medication. Tr. 407.

On September 24, 2010, Dr. Zayat completed updated assessments of Hawkins' physical and mental capabilities. Tr. 400-403. In these assessments, his findings largely mirrored his findings from his prior assessments of May 2009. Dr. Zayat upgraded Hawkins' abilities to crouch, kneel and crawl to occasional. Tr. 400. He also found that Hawkins' mental functional abilities had improved (he concluded that Hawkins had "good" abilities in 8 areas, had "fair" abilities in 8 areas, and "poor" abilities in 5 areas). Tr. 402-03.

On October 21, 2010, Hawkins saw Dr. Zayat and reported significant depression due to the murder of her 23 year old son, but denied suicidal ideations, stated she could sleep, and reported improvement in her tremors after stopping Depakote. Tr. 410. With the exception of noting that Hawkins appeared sad, Dr.

Zayat documented normal physical and mental status findings. Tr. 411. He recommended counseling, prescribed Doxepin, and recommended a brace for Hawkins' left hand. Tr. 411.

At an appointment on January 3, 2011 with Dr. Zayat, Hawkins complained of insomnia but denied vertigo, dizziness, headaches, and side effects from Doxepin. Tr. 415. Dr. Zayat noted that Hawkins' mother had called the doctor's office the previous week and expressed concern about Hawkins' rage and mood changes. Tr. 415. Dr. Zayat documented normal physical and mental examination findings and increased Hawkins' dose of Doxepin. Tr. 416.

On February 14, 2011, Hawkins saw Dr. Zayat and reported significant improvement in her mood and sleep with the medication adjustment. Tr. 419. She noted an increased appetite but otherwise reported no side effects from the medication. Tr. 419. Dr. Zayat documented only Hawkins' vital signs and made no changes to her medication regimen. Tr. 419.

**2. State Agency Physicians**
**a. Consulting Physicians**

At the state agency's request, Hawkins attended a consultative physical examination with Eulogio Sioson, M.D., on July 15, 2009. Tr. 309-16. She described her medical problem as a brain injury that caused intermittent tingling and numbness, tremors, headaches, vertigo, "absence seizures," memory and concentration problems, and rage. Tr. 309. She reported that she could only walk 1/4 of a block and could not use stairs, but that she had no problems sitting, doing household chores, dressing, grooming, showering, buttoning, tying, or grasping. Tr. 309. On examination, Hawkins walked normally without an assistive device. Tr. 309. She could not perform tandem walking or Romberg's testing due to balance problems but she was able to get up and down from the examination table. Tr. 309-10. Dr. Sioson noted unremarkable findings with respect to Hawkins' skin, heart, lungs, abdomen, and extremities. Tr. 309-10. She exhibited no neck or lower back tenderness, no rigidity, slight left hand tremors, intact sensation, normal manual muscle testing, no muscle atrophy, and intact and equal reflexes. Tr. 310. She performed finger-to-nose testing, alternating hand movements, and finger tapping without difficulty, although she was somewhat slower with the left hand. Tr. 310. Dr. Sioson opined that Hawkins' ability to do work-related functions such as walking, standing, sitting, carrying and lifting would be impaired and limited to sedentary activities. Tr. 310. Dr. Sioson concluded by noting the need for a "neuropsychological evaluation" to evaluate Hawkins' complaints of rage and memory difficulties. Tr. 310.

On July 31, 2009, Hawkins met with licensed clinical psychologist Jeff Rindsberg, Psy.D., at the state agency's request. Tr. 317-22. Hawkins recounted a history of childhood neglect, sexual abuse, homelessness, and substance abuse (alcohol, marijuana, and cocaine). Tr. 317-19. Hawkins reported that her only medication was Depakote and that it did not cause any side effects. Tr. 318. She denied a history of mental health treatment. Tr. 319. Hawkins stated that she showered, prepared meals, napped, watched television, cared for her personal needs independently, and interacted with family. Tr. 320. She stated that she could shop if someone was with her and that she walked rather than taking the bus. Tr. 320. Dr.

Rindsberg noted that Hawkins exhibited no major cognitive problems and had normal speech, logical and goal-oriented language, normal expressive/receptive language skills, decent insight, and fair judgment. Tr. 319. He also noted that Hawkins appeared to be in "decent spirits," showed a full-range affect, denied suicidal/homicidal ideations, and displayed no delusions, phobias, or psychosis. Tr. 319. Dr. Rindsberg considered Hawkins to have average intelligence. Tr. 319. He stated that she performed "remarkably well" on the mental status questions and that, "had her history not been known, there would have been no indication of underlying cognitive problems and her underlying traumatic brain injury." Tr. 319. Dr. Rindsberg noted that Hawkins did not have a major mental illness and seemed to be doing fairly well despite her statements to the contrary. Tr. 321. Dr. Rindsberg diagnosed cognitive disorder, not otherwise specified (NOS); alcohol, cannabis, and cocaine dependence, which he noted were in remission for a couple of years; and personality change due to traumatic brain injury, aggressive type. Tr. 321. He assigned a Global Assessment of Functioning (GAF) score of 60. Tr. 321. He opined that Hawkins could understand and follow directions, maintain attention, and perform simple, repetitive tasks, but that she would have moderate limitations in her ability to relate to others and withstand the stress and pressures associated with day-to-day work activities. Tr. 320.

**b. Reviewing Physicians**

On August 22, 2009, state agency psychologist R. Kevin Goeke, Ph.D., reviewed the record to assess the severity of Hawkins' mental impairments and her mental residual functional capacity ("RFC"). Tr. 323-40. He opined that Hawkins' cognitive disorder, NOS, and history of alcohol, cannabis, and cocaine dependence caused mild limitations in her ability to perform daily activities; moderate limitations in her ability to maintain social functioning; moderate limitations in her ability to maintain concentration, persistence, or pace; and no episodes of decompensation. Tr. 333. Dr. Goeke concluded that Hawkins retained the mental capacity to perform simple and some multi-step tasks in a stable environment with low production quotas and minimal contact with the general public. Tr. 339. State agency psychologist Vicki Warren, Ph.D., independently reviewed the evidence on December 21, 2009, and affirmed Dr. Goeke's opinion. Tr. 377-78.

On September 8, 2009, state agency physician Leigh Thomas, M.D., reviewed the medical evidence and assessed Hawkins' physical residual functional capacity. Tr. 368-75. Dr. Thomas opined that Hawkins could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and perform unlimited pushing and/or pulling consistent with her lifting and carrying abilities. Tr. 370-72. Dr. Thomas further opined that Hawkins should never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards (machinery, heights, etc.). Tr. 370-72. On December 22, 2009, state agency physician Willa Caldwell, M.D., independently reviewed the evidence and affirmed Dr. Thomas' RFC assessment in all respects. Tr. 379.

### C. Administrative Hearing
#### 1. Hawkins' Testimony

On December 20, 2010, Hawkins appeared with counsel and testified at an administrative hearing before the ALJ. Tr. 37-63. The ALJ asked Hawkins to explain the impairments that she believed kept her from working, in order of severity. Tr. 44. Hawkins responded that the worst of her problems was her rage. Tr. 44. She stated that it would occur even when not directed at others. Tr. 44. Hawkins stated that Depakote helped control her feelings of rage and calmed her rage down "extremely," but caused her to have worsening tremors in her hands. Tr. 49. She stated that her prescription was switched to Doxepin and she felt that, with this medication, her rage was "creeping back in." Tr. 51.

The second problem Hawkins stated that would prevent her from working were incidents where she would have a mental "blank," which she described as like daydreaming, where she would "drift off." Tr. 44-45. She stated that these incidents occurred several times in a day. Tr. 51. Hawkins also stated that she suffered from headaches but indicated that they had improved to some extent with medication. Tr. 45. She also complained of swelling in her legs and swelling of her left arm. Tr. 45. She stated that swelling in her legs worsened when she increased her activities around the house, and that she would elevate her legs on pillows to reduce the swelling. Tr. 46-47. For her problems with her left arm/wrist, Hawkins stated that her doctor had recently prescribed a brace to wear on the left wrist. Tr. 47. However, she indicated that she did not wear the brace continuously because it made her wrist ache. Tr. 47. Hawkins further testified that she had problems with her balance and that she experienced dizziness when bending over (tr. 61) or on a ladder. Tr. 62.

Hawkins testified about the limitations caused by her impairments. She stated that she could lift a five pound bag of sugar. Tr. 56. She also stated that she had no problems with walking or standing. Tr. 58-59. She explained that she could stand "for a good while," which she quantified as an "hour or two," before she would need to sit down. Tr. 58-59. Hawkins then stated that she could sit for "quite a few hours" before she would need to get up and move around. Tr. 59. She testified that she could only climb two flights of stairs at a time. Tr. 62.

Hawkins also testified as to her daily activities. She stated that she helped her father-in-law by washing his clothes, fixing him meals, and cleaning his restroom. Tr. 38-39, 53. She further explained that, when she did the laundry, she sometimes required help from her husband because the laundry facilities were down a flight of stairs in the basement. Tr. 54. Hawkins also stated that she loaded and unloaded the dishwasher and shopped occasionally with her husband. Tr. 53. For a few months in 2007, Hawkins performed full-time work as an operations manager for a real estate company. Tr. 40-42. She stated that she then looked for other work. Tr. 42. She also testified that she worked with her grandmother putting on plays and youth programs. Tr. 42.

#### 2. Vocational Expert's Testimony

Nancy J. Borgeson (the "VE") appeared at the hearing and testified as a vocational expert. Tr. 63-69. She stated that Hawkins had previously worked as receptionist, which was a semi-skilled position at the sedentary exertional level. Tr. 64. The ALJ noted, however, that the position was not substantial gainful activity. Tr. 64. The ALJ then asked the VE whether a hypothetical individual with Hawkins'

vocational characteristics and the following limitations could perform any work in the national economy:

> [C]ould work at the light exertional level; however, this person is not to climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. Further, this person must avoid hazards, such as working in unprotected heights or working around dangerous, moving machinery. This person can do simple, routine, repetitive tasks in a stable environment that is not fast-paced and does not have high production quotas – in other words, minimum production quotas. This person can have superficial contact with supervisors and co-workers, but only infrequent contact with the general public.

Tr. 64. The VE responded that the hypothetical person could perform unskilled, light work that existed in significant numbers in the national economy, including the following jobs: cleaner, housekeeping (2,500 jobs in the northeast Ohio, 12,000 jobs in Ohio, and 1,000,000 jobs nationally), mail clerk (non-postal) (1,400 jobs in northeast Ohio, 7,000 jobs in Ohio, and 139,000 jobs nationally), and visual inspector/gasket inspector (3,000 jobs in northeast Ohio, 15,000 jobs in Ohio, and 300,000 jobs nationally). Tr. 64-65.

Report and Recommendation at pp. 1-12.

### Report and Recommendation

Plaintiff filed her Complaint with this Court on May 15, 2012, challenging the final decision of the Commissioner. (Docket #1.) On March 19, 2013, the Magistrate Judge issued his Report and Recommendation. (Docket #16.) The Magistrate Judge found the ALJ's decision to be supported by substantial evidence. On March 28, 2013, Plaintiff filed objections to the Report and Recommendation. (Docket #17.) On April 25, 2013, the Commissioner filed a Response to Plaintiff's Objections. (Docket #19.)

### Standard of Review for a Magistrate Judge's Report and Recommendation

The applicable district court standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to the report. When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo*. FED. R. CIV. P. 72(b) provides:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

The standard of review for a magistrate judge's report and recommendation is distinct from the standard of review for the Commissioner of Social Security's decision regarding benefits. Judicial review of the Commissioner's decision, as reflected in the decisions of the ALJ, is limited to whether the decision is supported by substantial evidence. *See Smith v. Secretary of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989). "Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Casey v. Secretary of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) (citation omitted).

## Conclusion

This Court has reviewed the Magistrate Judge's Report and Recommendation *de novo* and has considered all of the pleadings, transcripts, and filings of the parties, as well as the objections to the Report and Recommendation filed by Plaintiff. After careful evaluation of the record, this Court adopts the findings of fact and conclusions of law of the Magistrate Judge as its own.

Magistrate Judge Burke thoroughly and exhaustively reviewed this case, and properly found the ALJ's decision to be supported by substantial evidence. Accordingly, the Report and Recommendation of Magistrate Judge Burke (Document # 16) is hereby ADOPTED. The Commissioner's final determination denying Plaintiff's application for Supplemental Security Income is hereby AFFIRMED.

This case is hereby TERMINATED.

IT IS SO ORDERED.

*Donald C. Nugent*
DONALD C. NUGENT
United States District Judge

DATED: May 9, 2013